Filed 2/28/14  In re A.B. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re A.B., a Person Coming Under the Juvenile Court Law. | |
| LAKE COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent, v. D.B., Defendant and Appellant. | A138855 (Lake County Super. Ct. No. JV320291) |

D.B. (Father), father of nine-year-old A.B., appeals from the juvenile court's orders removing A.B. from his care and placing her in foster care, and granting A.B.'s mother's (Mother) request for reunification services based on a change of circumstances. He contends there was insufficient evidence to support the juvenile court's finding that there was a risk of physical or emotional harm to A.B. if she were returned to his care. We reject the contention and affirm the orders.

**FACTUAL AND PROCEDURAL BACKGROUND**

*Original Petition*

An original dependency petition for then-seven-year-old A.B. was filed on April 1, 2011, alleging that Mother and Father had caused severe emotional damage to A.B. by "continually exposing [her] to an on-going custody dispute and their violence."  A.B. lived with Mother until Father refused to return A.B. after a visit he had with her in

1

December 2009.  Father returned A.B. to Mother after he was unable to obtain cash aid for A.B.  Due to Father's unwillingness to care for A.B. without cash aid, and the fact that Mother had become unable to provide appropriate care for A.B., A.B. went to live with her maternal aunt until May 2010, and thereafter, with Father and his girlfriend, J.S.

Mother tried to regain custody of A.B. on February 16, 2011, after seeing Father, J.S. and A.B. at a store.  An altercation ensued, and law enforcement was called.  On March 29, 2011, Mother gave a note to another child to give to A.B. at school, instructing A.B. to ride a different bus home so she could come live with Mother.  A.B. did as instructed and Mother hid A.B. under her bed as Father and J.S. searched for her.  When Mother denied knowing where A.B. was, Father and J.S. attacked Mother, and A.B. saw Mother being battered.  Father was arrested, and A.B. was taken into protective custody.

Father had a "history of violence," an extensive criminal history, "previous substance abuse issues," and an untreated mental health illness for which he refused to take medication.  He "scapegoat[ed]" A.B. and accused her of being "the source of the family's problems."  He made ongoing threats to send her away and told her she was "bad" and the "problem in the home."  Father did not ensure that A.B. attended school and left her with J.S., who also had untreated mental health issues for which she refused medication.

A.B. appeared fearful and angry when talking about Father and said she had seen him "beat-up" Mother on multiple occasions.  She "hate[d]" living with him and J.S. because "they are mean to her, call her names, talk bad about her mother, won't let her see her mother, and 'butt-whooped' [her] daily . . . ."  Father said A.B. was "unmanageable" and had emotional and behavioral issues.  He had not sought treatment for her because "Medi-Cal's doctor[s]" are "no-good" and because he was "adamantly against the use of psychotropic medications."  He was also unwilling to accept services by the Department of Social Services (the Department).  Mother had a history of chronic substance abuse.  She had sporadic contact with A.B. for a year before the petition was filed and had not been able to provide a stable living environment for A.B.

2

The jurisdiction report set forth the child welfare history, which included several unfounded or inconclusive allegations of general neglect and physical and emotional abuse. One referral that was "[e]valuated out" alleged general neglect of A.B. by Father and emotional abuse of A.B. by J.S. The report also included a summary of the altercation between Mother and Father and J.S. According to a police report, Mother said that J.S. swung at her with a closed fist and Mother covered her face to protect herself, then grabbed J.S.'s hair. Father pulled Mother by her legs and Mother fell to the floor, and J.S. held Mother's head while Father hit Mother. J.S. and Father hit her in the face, back and legs for three to five minutes. Mother did not wish to have Father and J.S. prosecuted. Father and J.S. gave conflicting statements to police. At an interview with the Department, Father denied he had assaulted Mother. J.S. said, "It was me. I beat the shit out of her."

The juvenile court sustained the petition. At a June 2011 disposition hearing, the court ordered reunification services for both parents. Mother's reunification services were terminated in December 2011; services were continued for Father. In March 2012, A.B. was placed with Father under a family maintenance plan but lived with her former foster mother until December 2012 because Father lost his housing and was unable to take her in until that time.

### Supplemental Petition

On March 11, 2013, a supplemental petition was filed alleging that the placement of A.B. into Father's home had not been effective because A.B. was suffering serious emotional damage as evidenced by Welfare and Institutions Code section 5150[1] hold and subsequent hospitalization due to severe anxiety, depression, withdrawal and aggressive behavior toward herself and others. Father left A.B. in J.S.'s care despite J.S.'s untreated diagnosis of bipolar disorder. He failed to make sure A.B. participated consistently in therapeutic counseling services and failed to fully cooperate with the Department. He

---

[1]All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

refused to work with the assigned social worker and continued to use punitive parenting tactics that contributed significantly to A.B.'s emotional breakdown and hospitalization.

At a March 11, 2013 detention hearing, Father testified he was working full-time and that A.B. was in school until 2:30 p.m., and in J.S.'s care after school. He was diagnosed with depression, post-traumatic stress disorder, and being "severely emotionally disturbed" when he was in his early twenties, when he was "doing a lot of drugs" and "under the influence of methamphetamines." He testified that on the day A.B. was hospitalized, she had become upset at his and J.S.'s decision to get rid of clothes that no longer fit her. A.B. accepted no compromise, and had emotional outbursts. She bit her knees, scratched her hands, slapped herself in the face, then verbalized thoughts of hurting her half siblings. Father, J.S., and A.B.'s therapist who was there that day decided A.B. needed to be evaluated for potentially being a danger to herself or others.

The juvenile court detained A.B. after finding that her continued placement with Father was not in her best interest because there was a substantial danger to her physical health, or she was suffering severe emotional damage.

At an April 19, 2013 contested jurisdictional hearing, Jaimee Gronendyke, a skills coach with the wraparound program, testified that she worked with A.B. for approximately six weeks to help her control her tantrums. Gronendyke was there the day A.B. was hospitalized. When Father and J.S. began discussing getting rid of clothes that were too small for her, A.B. began to tantrum, and they tried to work through it with compromises, telling her she could "earn a shopping trip with her dad once a week to pick out a new shirt to replace some of the ones that were too small." The situation worsened, and when A.B. finally calmed down, she matter-of-factly said, "I feel like hurting myself." Later, A.B. said she had recently tried to hurt one of her half siblings.

Gronendyke described A.B.'s tantrums and testified that she had seen other children do similar things; she believed it was "sort of a typical age-appropriate behavior." A.B., who shared her room with her three half siblings—a three-year-old boy, a two-year-old girl, and a one-year-old girl—complained about having to "help out with

4

them a lot." Gronendyke testified that it was "hard to tell exactly what [A.B.] felt towards [Father and J.S.], and that at times A.B. was "kind of distanced from both of them."

Sydney Berro, the wraparound care coordinator, testified that he worked with the family for about two months and saw them weekly. On one occasion, he overheard A.B. say to J.S., "Don't worry. I didn't tell them anything." On another occasion, the family told him they were unavailable for a meeting because they were going out of town, but A.B. was seen in the neighborhood. In another incident, J.S. said that A.B. had told her therapist about having suicidal ideation. The therapist told Berro that this was not true.

On another occasion, J.S. told Berro that A.B. was grounded because she had tried to sell a cell phone at school. However, the school informed Department social worker Linda Puertolas that the cell phone incident had never occurred. Puertolas also had reason to believe that J.S. was not being truthful about the "shirt incident at school." Father became upset at Puertolas for accusing J.S. of lying and told Berro he did not want Puertolas to be involved in his case. There was no indication that Father investigated the incidents on his own to determine whether J.S. had in fact fabricated them. Berro believed Puertolas was one of the most professional and honest social workers he had worked with, and believed she would have been an asset to the family if Father had not excluded her.

J.S. testified that she lived with Father and her three-year-old boy who has autism and two daughters, aged two and one. She enjoyed having A.B. in her home and denied she had tried to find out how to get her into a group home. J.S. suffered from Attention Deficit Hyperactive Disorder and was also bipolar. The bipolar disorder did not affect her because she had learned to control it over the years; her therapist told her she no longer needed medication for it. She denied telling a social worker that she stopped taking bipolar medication because she "just didn't like the way it felt." J.S. testified that she yelled at Mother in front of A.B. because she was "frustrated," even though she knew that doing so would bother A.B. She denied telling a social worker that she "beat the shit

5

out of" Mother. When asked whether she had ever stricken Mother, J.S. asserted her Fifth Amendment right not to incriminate herself.

J.S. testified that "Wendy" from A.B.'s school called to tell her that A.B. had tried to sell a cell phone at school. When J.S. tried to take A.B. to school the next day, Wendy said that A.B. had been suspended for a day. J.S. further testified that A.B. brought home a note from school that required her and Father to sign "regarding the school policies that [A.B.] needed to have longer T-shirts."

Father testified that he had never seen J.S. hit Mother. When asked whether J.S. had ever told him she hit Mother, Father responded, "No. We had never had a conversation in that depth." Father testified that he bought a cell phone for A.B. and told her she could earn minutes for its use by doing chores. One day, J.S. called to tell him that A.B.'s school had told her that A.B. was caught with a cell phone. A.B. had not yet earned any minutes on the phone, so it was not yet hers; thus, he believed she had "stolen" his phone. A.B. admitted to Father that she stole the phone and said she was trying to sell it to buy more lunches. The next day, J.S. told Father that she tried to take A.B. to school but was sent away because A.B. was suspended from school for one day. A.B. agreed with J.S. that she had been suspended.

Father testified that after the cell phone incident occurred, Puertolas called and was concerned that no one at the school would verify J.S.'s story. Father told Puertolas, "You need to contact the school and have the school contact me. Otherwise, basically, I'm not believing what you're saying." Father did not verify with the school whether J.S. had told him the truth. He decided he did not want to work with Puertolas because she accused J.S. of lying. When asked whether he was now willing to work with Puertolas, he responded, "I suppose if I had to, obviously I'd just have to do what I need to do for my child. But in my personal light, I'd just like to go home and raise my family."

Father testified that J.S. also told him that someone from A.B.'s school had called to tell her that A.B.'s clothing was inappropriate. Father and J.S. "just went in there and started looking at shirts that day when the behavioral therapist was there with [A.B.]." He testified, "We actually tried doing it in front of someone so that they could observe

6

[A.B.'s] overreaction or whatever action she had at that point." He testified that A.B. kept "upping the ante" and got increasingly upset. He said that allowing her to keep the clothes and not wear them "was not an option."

Father testified that A.B. had "hygiene problems" and was "emotionally distraught." She was "very withdrawn" and "very defiant" towards J.S., with whom she "bumped heads." J.S. was in charge of taking care of all four children "most of the time" because he worked. A.B. would always say, "You're not my mom," and J.S. was "a little upset" that A.B. did not like her very much. Father could "really tell" that A.B. missed Mother. A.B. began pinching her own hand and biting her knees in 2012. She would "rock," "pull her knees to her chest and set her face in her knees," "pick at her hands," and "bite her knees." He was concerned about A.B.'s depression but did not think she would hurt herself, until she did so the day she was hospitalized. He was concerned about his younger children but did not believe A.B. had choked her baby half sister because the baby was asthmatic and would have been "gone" in seconds if she had been choked.

After A.B. was given a section 5150 assessment, she was hospitalized for one week. Father told the hospital staff to restrict A.B.'s recreational activities, e.g., not have "play time," "movie times," television time, and "Bingo times," while she was there because he wanted A.B. to understand the situation was not a game. He said, "it wasn't to be a fun time because it wasn't fun time. It was serious time." He testified that he made the rules in the family and J.S. implemented them. He was "not a slave driver" but expected everyone to do their share. If A.B. did not follow the rules, she was required to sit on her bed in her room for "punishment time."

Father testified that he had previously been opposed to giving A.B. any psychotropic medication but that he did not feel "quite as [opposed as he] used to given the situations that ha[d] transpired." He stated that if A.B. was returned to his care, he would try to keep everyone in his home safe by providing constant "attention" and "monitoring." He had taken steps to ensure that A.B. would be separated from her half siblings "so that . . . she does sleep alone without the children around. Just monitoring,

7

monitoring, monitoring. Make sure that she takes her medication so that she keeps her depression under control."

Father testified that although A.B. missed Mother and there was no court order prohibiting contact between them, he did not believe they should have contact because A.B. "deserve[d]" better than a mother who did not "fight" for her. He stated, "My daughter deserves a fighter. My daughter deserves somebody who will do anything for her." "In my personal opinion, I don't think [Mother] deserves to hear my daughter's voice at this point. But as far as my daughter, I believe she has a right to talk to her mom. And I guess I'll let her do that. . . ."

Puertolas testified that she and Berro went to Father's house for the first time on January 24, 2013. A.B. was there with a sitter and was "pretty high-spirited" as she sat in the living room with them. Shortly thereafter, Father and J.S. came home and sent A.B. to her room. J.S. said that A.B. was being disciplined for stealing a cell phone from Father and for trying to sell it at school. J.S. said that school staff confiscated the phone and suspended A.B. for a day. A.B. cried hysterically. As Puertolas and Berro were leaving, Berro overheard A.B. say to J.S., "Don't worry. I didn't tell them anything."

Puertolas went to A.B.'s school and met with A.B., who said she had never stolen a cell phone and that J.S. had "made . . . up" the story. Puertolas spoke to A.B.'s teacher, who said she knew nothing about the cell phone. Puertolas also spoke to Wendy S. (Wendy), the school secretary, who said she knew nothing about the cell phone or a suspension and said "there was nothing in their school database that identified that that had occurred." When Puertolas contacted Father to try to get clarification as to what J.S. had told him and ask if he had spoken to the school, he became upset and "short" with her, and "hung up on" her.

Puertolas testified that she also investigated the situation relating to J.S. and Father's decision to get rid of A.B.'s shirts, which A.B. referred to as her "pretty clothing." She testified that J.S. told her that someone at the school told J.S. that A.B.'s shirts were too short. When Puertolas asked J.S. who at the school had contacted her, J.S. was not able to give a name. When Puertolas again spoke to J.S., J.S. said that it was

8

Wendy, the school secretary, who had contacted her. Puertolas therefore contacted Wendy, who said no such communication had taken place. Wendy told Puertolas that there was no dress code for A.B., and that while there was a dress code for older students, a student who showed up with "holey clothes or inappropriate clothes" would simply be sent to the "Healthy Start department room [to] get a change of clothing." Puertolas asked Wendy if she had complained about A.B.'s clothing to J.S. Wendy responded that she had not and that she knew nothing about it.

Puertolas learned that on another occasion, J.S. reported that the school had called her after A.B.'s therapy appointment to report that A.B. said she felt like killing herself. A.B.'s teacher told Puertolas that she knew nothing of this or the improper clothing or the cell phone incident. The school reported that A.B. had no disciplinary issues or emotional problems.

Puertolas opined that A.B. needed to be placed outside of Father's home because the placement was not working to alleviate her emotional problems. She believed she could work with Father, who had "done a lot," loved his daughter and was "committed," but felt the issue "may be beyond what . . . he can apply to [A.B.]." She noted that J.S.'s emotional issues had also not been addressed and that J.S. had previously told another social worker that she stopped taking medication because she did not like the way it made her feel. J.S. also told Puertolas that there was a "no-contact order" against Mother seeing A.B. and that allowing them to see each other was "detrimental to her emotional well-being." Puertolas searched for information verifying that there was such an order but could not find any. Puertolas testified that she believed Father had not been cooperative with her attempt to provide services to his family because he had refused to work with her. It also concerned her that when she encouraged him to talk to the school to verify J.S.'s story, he "just completely shut me out from that encouragement or trying to see that we might have a problem. And . . . he didn't see the need to follow through on that [on A.B.'s] behalf."

Puertolas testified that A.B. is "very connected, bonded" with Mother. They were having weekly visits and joint therapy sessions. A.B. was very happy when she was with

9

Mother and followed Mother's directions well. The visits were "wonderful" and "touching." Mother was testing clean, had connected with a psychiatrist, and was taking care of her needs. She was cleaning up her substance abuse criminal history by participating in a drug diversion program. A.B. was also meeting with Father on a weekly basis. She was receptive to him but had "emotional outbursts" and would break down crying, saying she did not want to "talk about it" when Father asked inappropriate questions.

Puertolas further testified that she was not sure if A.B. would hurt herself if returned to Father's care, but was also not sure A.B. was strong enough to handle another meltdown. Puertolas believed that nurturing parenting rather than punitive parenting was appropriate for A.B. A.B. had repeatedly, consistently, and adamantly said she did not want to return to Father's home. Puertolas acknowledged she had not seen a psychiatric evaluation confirming that J.S. actually had an untreated mental health diagnosis. She acknowledged that while watching J.S. interact with A.B., no diagnosis appeared to be present.

Mother testified that she left Lake County on June 23, 2011, after A.B. was detained. She did not attempt to contact A.B. She contacted CPS on October 29, 2012, and asked how to get in touch with A.B. A social worker suggested that she write a letter to A.B. The social worker said she would give the letter to A.B.'s therapist and that they would review it in therapy. Mother wrote the letter in November and sent it in December. Mother denied ever having spoken to J.S. to make arrangements to call A.B.

Counsel for A.B. introduced into evidence A.B.'s letter to the court, which stated, "[A.B.] wants to go with her mother. [T]o Judge [p]lease let me go with my mom Judge I'm Begging you." "I don't want to go to court Just let me go with my mother. I will refuse to go with [J.S.] and my dad." The juvenile court found the allegations in the supplemental petition were true and that the previous disposition had not been effective in protecting A.B. The court set the matter for a contested disposition hearing.

10

***Mother's 388 Petition and Disposition on the 388 Petition and Supplemental Petition***

Meanwhile, Mother filed a petition under section 388 requesting a change in the juvenile court's December 2011 order terminating reunification services to her. She requested family maintenance services or six months of reunification services. She alleged this would be in A.B.'s best interest because reunification with Father had not been successful and she and A.B. had a significant bond. She had been drug free for 18 months, had returned to Lake County temporarily to be able to visit A.B. weekly and participate in her weekly therapy, and was willing to remain there long enough to reunify with A.B. and complete her drug diversion program.

The juvenile court decided to hear the 388 petition on the same day as the disposition hearing on the supplemental petition. In a report prepared for the hearing, the Department stated that Mother had begun to renew her relationship with A.B. by contacting the social worker regularly starting in October 2012. She returned to Lake County at the end of March and took steps to address her earlier failure to follow through with a drug diversion program by re-engaging in the program. She began attending weekly therapy sessions with A.B. in early April 2013. Visits between A.B. and Mother were fun and affectionate and often included her maternal aunt and Mother's new baby boy. After each visit A.B. told the social worker how happy she was, and there were no negative experiences noted at any of the visits. A.B. was aware she could call Mother from her foster mother's home, and had done so four times.

A.B. was in good health, well behaved at school, and doing well socially and academically. Her diagnosis at discharge from the hospital was: "Intermittent Explosive Disorder and Post Traumatic Stress Disorder." She was prescribed 50 mg of Zoloft daily. She was placed in an intensive therapeutic foster home. She liked her placement and her foster family had not reported any behavioral problems; she was compliant and cooperative. At a follow-up medical appointment, her Zoloft prescription was reduced to 25 mg daily, beginning in August 2013. Her eating and sleeping routines were "well within norms" and there no concerns regarding hygiene.

Father and J.S. continued to live together with their three young children. Father and J.S. visited A.B. weekly. The first visit in mid-March was "emotionally challenging" for A.B., who asked in advance if J.S. was going to be present. When A.B. and the social worker arrived at the park, Father and J.S. acted aloof and scowled at A.B. As A.B. happily approached Father, he kept his hands deep in his pants' pockets. He did not express any verbal or facial affection toward A.B. and his demeanor suggested he was angry and not happy to see her. The first words of acknowledgement of A.B. came from J.S. in the form of a comment that A.B. was not to wear the "Booty Shorts" that she was wearing again. About ten minutes after A.B., Father, and J.S. went to sit on swings, A.B. began to cry loudly. The social worker approached and asked why she was crying, and she sobbed, "My mother must hate me or she would be here now when I needed her." Neither Father nor J.S. tried to console or calm her, but A.B. regained her composure and the visit continued. At the end of the visit, neither Father nor J.S. showed any signs of affection toward A.B. A.B. told the social worker, "I was happy to see my father and J.S., but they did not act like they were happy to see me."

During a visit in late April, A.B. cried and continued to do so as Father and J.S. spoke to her. When the social worker asked Father and J.S. to refrain from their conversation with A.B. because it was apparently upsetting her, J.S. said she was trying to convince A.B. to go play and added, "You know, it's not always the parent." On the drive back, A.B. said she cried because "[J.S.] was asking me questions about my therapy sessions with my mother. I told her that I did not want to talk about it, but she would not listen and she kept asking me. She told me that I would not be able to live with my mother." Other visits were either uneventful or canceled by Father. A.B. was aware she could call Father any time she wanted, but never did. The Department recommended that A.B. remain in out-of-home placement, the matter be set for a permanent placement plan, and the parents continue to have supervised visits with A.B.

At a contested hearing on Mother's 388 petition and disposition on the supplemental petition, the Department's counsel and A.B.'s counsel supported Mother's petition for reunification services. Mother testified that she left Lake County with a

12

friend on June 23, 2011.  She became pregnant and sought services with regard to her unborn child, including prenatal medical care.  Her baby was born in June 2012.  The last time she used drugs was November 23, 2011, when she learned she was pregnant.  Before that, she had been clean for three and a half years, but had relapsed when her mother died.  When she found out she was pregnant, she decided to make the commitment to be a parent.  She began seeing her psychiatrist regularly.  She started taking her medication and her bipolar disorder was under control.

Mother moved to Washington and was living with her baby son and her son's aunt when she heard that A.B. was in a mental institution.  She decided to return to Lake County "to fight for her"—something she had been planning on doing.  She had outstanding warrants for not completing a drug diversion program before leaving California, so she enrolled herself in the program and signed up for Alcohol and Other Drug Services.  She had not used any controlled substances and had consistently tested clean, one to two times a week.  She was living with her sister in Lake County at the time of the hearing and planned to return to Washington after completing her six-month drug court program.  She hoped to take A.B. with her but also acknowledged the importance of having her maintain contact with Father because she knew that Father "loves [A.B.] very much" and she did not wish to "take [A.B.] from her father."  Since March 29, 2013, Mother had been seeing A.B. three hours a week for visits and therapy sessions.

Puertolas testified that Mother had been testing clean for the Department since April 2, 2013.  Puertolas had reviewed her drug test results from the diversion program and confirmed they were consistently clean.  She had observed at least one dozen visits between Mother and A.B., and they were always positive.  Puertolas supported Mother's request for renewed reunification services because she believed it was in A.B.'s best interest.  She believed Mother would be successful in reunifying with A.B. within six months if given the opportunity.

Puertolas testified that shortly after her removal from Father's home and placement in a foster home, A.B. said she wanted to kill herself because children to whom she told a joke did not think it was funny.  About two weeks before the hearing,

13

A.B. got mad at a boy her age and tried to choke him. She then became upset with herself and hit, bit and pinched herself. A week before the hearing, A.B. said she had been in foster care too long and said, "Maybe I should just kill myself." Puertolas was opposed to offering reunification services to Father because she did not think A.B. was emotionally strong enough for it. A.B. told Puertolas several times that she wanted to be with Mother; she never said she wanted to return to Father's home.

The juvenile court found that Mother had demonstrated a change of her circumstances and that it was in A.B.'s best interest to grant Mother six months of reunification services. As to disposition on the supplemental petition, the court found that A.B. should remain in out of home placement because returning to Father would create a substantial risk of detriment to her safety, protection, physical and/or emotional well-being.

## DISCUSSION

Father contends there was insufficient evidence to support the juvenile court's dispositional findings on the supplemental petition. We disagree.

" 'When the sufficiency of the evidence to support a finding or order is challenged on appeal, the reviewing court must determine if there is any substantial evidence, that is, evidence which is reasonable, credible, and of solid value to support the conclusion of the trier of fact. [Citation.] In making this determination, all conflicts [in the evidence and in reasonable inferences from the evidence] are to be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact. [Citation.]' . . . [Citation.] However, substantial evidence is not synonymous with *any* evidence. [Citations.] . . . '[w]hile substantial evidence may consist of inferences, such inferences must be ' "a product of logic and reason" ' and ' "must rest on the evidence" ' [citation]; *inferences that are the result of mere speculation or conjecture cannot support a finding* [citations]' [Citation.]" (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393–1394.)

Here, the evidence showed that while in Father's home, A.B. was subjected to J.S.'s malicious and severely emotionally damaging lies on a regular basis. Knowing that

14

Father would take J.S.'s word over hers, and perhaps due to fear of further punishment,[2] A.B. was compelled to admit the truth of those lies, and "cri[ed] hysterically" as she was unjustly punished. Father continued to believe J.S. even after Puertolas presented him with evidence that J.S. had fabricated the stories, and instead of looking into the matter for his daughter's sake, he refused to work with the social worker who, in Berro's opinion, was professional and honest and would have been an asset to the family. When asked at the hearing whether he was willing to work with Puertolas, Father said, "I suppose if I had to," but also noted that what he would like to do is to "just . . . go home and raise [his] family."

Ultimately, after J.S. tormented A.B. with yet another lie that resulted in her being forced to give up her "pretty clothing," A.B. deteriorated to a point where she had to be evaluated and hospitalized for being a potential danger to herself and to others. Even after A.B. was hospitalized, Father continued to engage in punitive parenting by demanding that the psychiatric hospital staff withhold television and other privileges from A.B. so that she would understand that this was "serious" and not a "game." He continued to express his disapproval of A.B. by being angry and distant towards her during their first visit, and he and J.S. engaged in inappropriate discussions with her during other visits that caused her to cry, including telling her she would not be able to live with Mother, asking her about her therapy sessions with Mother, and suggesting that Mother did not care about her. A.B. repeatedly, consistently, and adamantly said since being hospitalized that she did not want to return to Father's home, and she had written a note to the court "[b]egging" that she not be required to return to his care.

Puertolas opined that placement in Father's home had not worked to alleviate A.B.'s emotional problems, and would not be in A.B.'s best interest. She noted that A.B. needed to be in a nurturing—not punitive—environment, and the issues that needed to be addressed were beyond the scope of what Father was capable of addressing. Puertolas was also very concerned about J.S.'s dishonesty and fabrication of stories, and about

---

[2]As noted, Berro testified that he overheard A.B. telling J.S., "Don't worry. I didn't tell them anything."

15

Father's refusal to follow up on the issue on his daughter's behalf. She was not sure if A.B. would hurt herself if returned to Father's care, but was also not sure A.B. was strong enough to handle another meltdown. Under these circumstances, the juvenile court could reasonably determine that there was a substantial risk of physical or emotional harm if A.B. were returned to Father's care.

We do not find any of Father's argument persuasive. He asserts, for example, that this was a "case of over-reaction" because A.B.'s tantrums were typical of a child her age and were caused by Mother's abandonment. The record shows, however, that while in Father and J.S.'s care, she deteriorated to a point where she had to be evaluated, hospitalized, and placed on medication. Father also suggests that his refusal to work with Puertolas was justified because she had "too much [of an] ego" and failed to make an effort to "earn [his] trust." The record shows, however, that Father was the one who acted unreasonably in refusing to take Puertolas's concerns seriously, and insisting on believing J.S. despite objective evidence to the contrary. Father also states there was no psychiatric evaluation in the record confirming that J.S. had an untreated diagnosis of bipolar disorder. J.S. testified, however, that she had previously been diagnosed with bipolar disorder, and there was evidence that she had told a social worker that she had stopped taking medication for it because she did not like the way it made her feel.

Father also argues that the juvenile court applied the incorrect standard when it made its dispositional findings by a preponderance of the evidence, instead of by clear and convincing evidence. The Department responds that at a disposition hearing held incidental to a supplemental petition, a renewed finding of substantial risk by clear and convincing evidence is not required. (See *In re A.O.* (2010) 185 Cal.App.4th 103, 109–113.) Here, we need not—and therefore will not—determine whether the court should have made its findings by clear and convincing evidence, because even assuming the court should have done so, we would conclude the error was harmless under any standard.

At the end of the jurisdiction hearing, the court stated, "the previous disposition clearly has not been effective in protecting or rehabilitating the child. The child ended up

16

. . . in a mental hospital, 5150'd, with homicidal and suicidal ideations, if not having actually carried out an attempted homicide. There was at least thoughts of homicide and describing how she would do it. If she didn't actually do it, she certainly described how she would do it. That's extremely alarming in a 9-year-old child. I don't see how it could be safe to return that child to that environment at this point." The court expressed similar views after the disposition hearing in finding that returning A.B. to Father's care would create a substantial risk of detriment to her safety, protection, physical and/or emotional well-being. In light of the overwhelming evidence supporting that finding, we believe, beyond a reasonable doubt, that the court would have made the same determination under the clear and convincing evidence standard.

## DISPOSITION

The juvenile court's orders are affirmed.

_____
McGuiness, P.J.

We concur:

_____
Jenkins, J

_____
Pollak, J.

17